## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| CRAIG E. ZINN, | CASE NO. 1:20-CV-01752-SL |
| Plaintiff, | JUDGE SARA LIOI |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Craig E. Zinn filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying supplemental security income ("SSI"). (ECF #1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On August 10, 2020, pursuant to Local Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a report and recommendation, and on May 26, 2021, this matter was reassigned to me pursuant to General Order 2021-06. (Non-document entry dated May 26, 2021). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the decision of the Commissioner.

### PROCEDURAL BACKGROUND

Mr. Zinn filed for SSI on May 8, 2018, alleging a disability onset date of February 2, 2015. (Tr. 171). His claims were denied initially and on reconsideration. (Tr. 60-90). Mr. Zinn then requested a hearing before an administrative law judge. (*Id.*). Mr. Zinn (represented by counsel)

and a vocational expert ("VE") testified at a hearing before the ALJ on July 24, 2019. (Tr. 36-59). On August 27, 2019, the ALJ issued a written decision finding Mr. Zinn not disabled. (Tr. 12-30). On June 9, 2020, the Appeals Council denied Mr. Zinn's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6; *see also* 20 C.F.R. §§ 416.1455, 416.1481). Mr. Zinn timely filed this action on August 10, 2020. (ECF #1).

FACTUAL BACKGROUND

I. ADMINISTRATIVE HEARING

Mr. Zinn, represented by counsel, appeared at a hearing before the ALJ on July 24, 2019, along with a VE. (Tr. 36-59). In his opening statement, Mr. Zinn's attorney alleged an amended onset date of March 28, 2018, making Mr. Zinn over 50 years old at all relevant periods. (Tr. 39). Mr. Zinn's main impairments were alleged as a posttraumatic complex partial seizure disorder and post-concussive syndrome, both as confirmed by Dr. Gary Kutsicovich. (*Id.*). Mr. Zinn also suffered from severe degenerative disk disease affecting his right knee, cervical and lumbar degenerative disk disease, depressive disorder and PTSD. (*Id.*). Mr. Zinn's counsel asserted the neurological and emotional mental health conditions had not been fully developed at the state agency level, but additional objective evidence had been gathered since, permitting the ALJ to find Mr. Zinn disabled due to his memory issues and concentration deficits. (*Id.*). Mr. Zinn testified that his symptoms had significantly worsened in the 12 to 18 month period prior to the hearing. (Tr. 52-53). He experienced many more bad days than good days. (Tr. 52, 54).

Mr. Zinn testified he lived on his own with his service dog, although his sister Victoria lived within 150 yards of his home. (Tr. 40). His sister paid for his home. (*Id.*). He had been unable to drive for over a year; his sister drove him to the hearing. (Tr. 41). His sister also helped

2

by getting dog food and taking his dog out when he did not feel well. (Tr. 48). She reminded Mr. Zinn to take his medications. (Tr. 49). Mr. Zinn also had increasing difficulty in getting himself dressed. (Tr. 48). If he did not have any appointments or need to be anywhere, he would not shower or change his clothes. (*Id.*). He used to enjoy cooking, but could no longer prepare food beyond simple meals like canned soup, boiled chicken, sandwiches, or cereal. (Tr. 49-50). He played guitar, but required a carpal tunnel brace to play due to wrist pain. (54-55). Mr. Zinn testified to an inability to manage his own expenses; he required his sister's help in paying his bills, even when he lived in assisted housing. (Tr. 50).

Mr. Zinn's last work attempt had been ringing bells for the Salvation Army, part-time, in three- to four-hour shifts. (Tr. 41-42). He had a difficult time in that job due to pain he experienced while standing; the cold temperatures and windy weather exacerbated his pain. (Tr. 42). The ALJ questioned whether alcohol was a factor in Mr. Zinn's past failed attempts for work, but Mr. Zinn denied that was an issue. (Tr. 43). Mr. Zinn testified to 20 years of sobriety, as well as passing a recent drug test. (*Id.*). Instead, in Mr. Zinn's estimation, his mental health issues— including an accident where he was struck by a car while riding his bike—prevented him from working. (*Id.*). After that accident, Mr. Zinn and his sister both noticed worsening of his physical and mental problems, including short-term memory issues and light sensitivity, which caused migraines. (Tr. 41, 43-44). Mr. Zinn testified to having migraines twice per week in which he experiences light sensitivity, pain, and vomiting. (Tr. 51). He has had CAT scans and MRIs, but has not found relief. (Tr. 51-52).

Mr. Zinn testified to experiencing numerous concussions. (Tr. 44). Prior to the hearing, he had made a list—in his estimation, he had experienced more than 30 concussions since childhood.

(*Id.*). His first concussion was when he was five or six years old. (*Id.*). He believed—and had recounted to his therapist—that his depression and borderline suicidal behavior was due to these childhood concussions. (*Id.*). As a result of these concussions, Mr. Zinn experienced what he calls "brain lock" in which he is unable to recall common words or respond to specific questions. (Tr. 45). He must wear a baseball cap and sunglasses due to light sensitivity from his post-concussion syndrome. (*Id.*).

Mr. Zinn testified to his recurrent seizures, for which he is receiving treatment from Dr. Kutsicovich. (Tr. 45). Dr. Kutsicovich believes the seizures are connected to the post-concussion syndrome. (*Id.*). Mr. Zinn testified to two or three nighttime seizures per week, with muscle cramps, biting his mouth and tongue, and breaking teeth. (Tr. 45-46). He described the pain as "being electrocuted." (Tr. 46). Mr. Zinn also testified to multiple seizures while awake, and again described the pain as "being electrocuted." (Tr. 46-47).

Mr. Zinn testified to requiring a cane for ambulation and balance constantly for the six months prior to the hearing. (Tr. 47-48). He required the use of a cane due to dizzy spells and the arthritis in his hip and knee. (Tr. 40-41). He could stand for 20-30 minutes without experiencing pain in his knee, hips, and lower back. (Tr. 53). Some days he has difficulty even walking the five steps in front of his trailer to take his dog out. (Tr. 53-54).

The VE then testified. (Tr. 56). The ALJ posed the following hypothetical question: can an individual of the same age, education, and work experience as the claimant, who is limited to light work, no climbing of ladders, ropes, or scaffolds, occasional climbing of ramps and stairs, frequent stooping and crouching, who must avoid concentrated exposure to extreme temperatures, humidity, and pulmonary irritants and who must avoid even moderate exposure to unprotected

heights, operating dangerous machinery, and moving mechanical parts, and further limited to performing simple tasks and following simple instructions with few workplace changes, if any, perform any work in the national economy. (Tr. 56). In response, the VE identified the following jobs: marker, SVP (specific vocational preparation) 2, light, with 2,046,000 jobs in the national economy; garment sorter, SVP 2, light, estimated 256,000 jobs in the national economy; checker I, SVP 2, light, estimated 72,000 jobs in the national economy. (Tr. 56-57). In a second hypothetical, the ALJ limited lifting and carrying up to ten pounds occasionally, standing and walking no more than two hours in an eight-hour workday, in addition to the restrictions listed in the first hypothetical. (Tr. 57). The VE testified that no work would be available for such a hypothetical individual. (*Id.*).

Mr. Zinn's counsel questioned the VE, adding to the first hypothetical a restriction of being off-task 25 percent or more of the day. (*Id.*). The VE testified that would be work preclusive. (*Id.*). In addition, an individual needing to be absent more than four days per month would be work preclusive. (Tr. 57-58). Finally, if the hypothetical individual required an assistive device such as a quad cane to stand or walk, that individual would not be able to perform the full range of light work. (Tr. 58).

## II.  PERSONAL AND VOCATIONAL EVIDENCE

Mr. Zinn was born on March 13, 1968 and was 50 years old as of his application date of March 28, 2018. (Tr. 17, 28). He was therefore defined as a "individual closely approaching advanced age." (Tr. 28 *see also* 20 C.F.R. § 416.963). Mr. Zinn has not been employed in work meeting the standard of "substantial gainful activity" ("SGA") under the Social Security Act

("Act"). (Tr. 17 *see also* 20 C.F.R. § 416.972). Therefore, Mr. Zinn has no past relevant work experience. (Tr. 28).

III.   RELEVANT MEDICAL EVIDENCE[1]

A.     Dr. Gary Kutsikovich.

Gary R. Kutsikovich, M.D., is a neurologist who treated Mr. Zinn's seizure disorder and his post-concussive syndrome. (*See, e.g.*, Tr. 465). On May 15, 2018, a neurology follow-up report noted Mr. Zinn's neurological symptoms "affect his daily activities." (Tr. 468). Dr. Kutsikovich noted breakthrough headaches, dizziness, confusion, difficulty with short-term memory, and blurred vision. (*Id.*). In addition, Dr. Kutsikovich observed twitching and abnormal involuntary movements, followed by confusion; these symptoms were worse at night. (*Id.*). Mr. Zinn most recently experienced head trauma on November 7, 2017. (Tr. 468, 472). Dr. Kutsikovich's follow-up notes from shortly after the injury—November 9, 2017—noted no acute hemorrhage, despite Mr. Zinn's breakthrough migraines, dizziness, confusion, memory loss, blurred vision, and twitching. (Tr. 472). Dr. Kutsikovich's notes indicate these increased breakthrough migraines, dizziness, confusion, memory loss, blurred vision, and twitching continued in his May 2018 visits. (Tr. 468).

At Mr. Zinn's August 15, 2017 and December 4, 2018 visits, Dr. Kutsikovich noted breakthrough headaches and seizure activity, as well as dizziness, confusion, difficulty with short-

---

[1]     Mr. Zinn challenges the ALJ's determination that he was not disabled, and focuses his argument on the ALJ's evaluation of his osteoarthritis and his need to use a cane. (*See* Pl.'s Br., ECF #14, PageID 942-57). As such, he waives argument on issues not raised in the opening brief. *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003). Mr. Zinn's ambulation is affected by his post-concussion syndrome and seizure disorder, in addition to his osteoarthritis. I therefore summarize the records related to those conditions.

term memory and blurred vision. (Tr. 465, 474). Mr. Zinn required repetition during the exam. (*Id.*). Initially, Mr. Zinn preferred treating his migraines with over-the-counter medications, but later required prescription medication. (Tr. 465, 479). On December 4, 2018, Dr. Kutsikovich noted Mr. Zinn had difficulty tolerating higher doses of Tegretol and baclofen, two medications that helped his migraines. (*Id.*). Dr. Kutsikovich then started Mr. Zinn on Topamax, an anticonvulsant that might also help with the migraines. (Tr. 465).

On July 25, 2017 and December 4, 2018, Dr. Kutsikovich ordered semi-regular ambulatory EEGs to monitor Mr. Zinn's breakthrough seizures. (Tr. 465, 473). These EEGs show intermittent generalized sharp wave consistent with post-concussion syndrome, and mildly epileptiform in nature. (*Id.*).

Ambulatory EEG summary reports from June 7, 2018 and February 5, 2019 note intermittent generalized sharp waves, which may be epileptiform in nature. (Tr. 466, 470). The EKG showed otherwise normal sinus rhythm. (*Id.*). An MRI from June 7, 2018 showed a left choroidal fissure cyst 1.3 cm in size, unchanged from July 2017. (Tr. 471). A summary on February 4, 2019 showed an unremarkable routine EEG. (Tr. 467).

Dr. Kutsikovich completed a physical medical source statement on June 20, 2019. (Tr. 461-64). Dr. Kutsikovich stated he based his opinion in the medical source statement on his having treating Mr. Zinn since May 18, 2017 for seizure disorder and post-traumatic cephalgia and cervicalgia. (Tr. 461). As a result of his symptoms, Mr. Zinn could sit for 20 minutes at a time, stand for 45 minutes at a time, sit and stand/walk for less than 2 hours per day. (Tr. 462). In Dr. Kutsikovich's opinion, Mr. Zinn would need to take a break twice an hour for 20-30 minutes due to muscle weakness, chronic fatigue, and "Pain/ paresthesias, numbness." (*Id.*). Mr. Zinn would

7

need to elevate his legs 25 percent of the workday. (Tr. 463). Dr. Kutsikovich stated Mr. Zinn must

use a cane all the time due to pain, weakness, and dizziness. (*Id.*). Dr. Kutsikovich opined Mr.

Zinn could lift less than 10 pounds occasionally, rarely up to 20 pounds, and never lift 50 pounds.

(Tr. 463). According to Dr. Kutsikovich, Mr. Zinn would be off task 25 percent of the workday,

would have good days and bad days, and would miss more than four days of work per month. (Tr.

463-64). In addition, Dr. Kutsikovich stated Mr. Zinn should be limited in lifting, heights, driving

(for six months post-seizure), fumes, extreme temperatures, loud sounds, and flashing or bright

lights. (Tr. 464).

### B. Dr. Walker

James Walker, M.D., treated Mr. Zinn for osteoarthritis. (Tr. 539-550). Mr. Zinn started

seeing Dr. Walker after a knee injury on or around December 9, 2018. (Tr 543, 856). At the initial

visit on January 14, 2019, Dr. Walker noted an x-ray showed Grade I osteoarthritis with narrowing

of the patellofemoral space. (Tr. 543). Dr. Walker's notes show Mr. Zinn required a cane, but was

able to bear weight on his knee with the cane. (*Id.*). Dr. Walker recommended cortisone injections,

which could be repeated every three months. (*Id.*). At the follow-up appointment on February 18,

2019, Mr. Zinn reported minimal and short-term relief from the cortisone injection, and was in

"significant" pain. (Tr 541). Mr. Zinn's knee "gave out" on him the day prior, and he continued to

require a cane. (*Id.*). Dr. Walker noted the knee pain affected Mr. Zinn's activities of daily living,

including performing household chores, engaging in hobbies, dressing, sleeping, walking, and

navigating stairs. (*Id.*).

An MRI from March 25, 2019 showed severe patellofemoral and medial tibiofemoral

osteoarthritis. (Tr. 539). Mr. Zinn complained of pain in his right knee, radiating to his right

thigh. (Tr. 539). Dr. Walker noted associated symptoms of instability, stiffness, swelling, and crepitus. (*Id.*). Dr. Walker also found mild swelling, strength at 4/5 and tenderness to palpation of the quadricep tendon, but range of motion was otherwise good. (*Id.*). Dr. Walker treated Mr. Zinn with a cortisone injection and recommended physical therapy and a hinged knee brace. (Tr. 540).

On June 10, 2019, Dr. Walker reported Mr. Zinn still had right knee pain, required use of a cane, and the injection had only helped for a week. (Tr. 852). Mr. Zinn required a cane at a May 20, 2019 visit as well and treatment notes reported increased swelling in the knee. (Tr. 854).

### C.     Lake Health Physician Group

Mr. Zinn saw John Samsa, D.O., at Lake Health Physician's Group on August 20, 2018. (Tr. 555). In that appointment, Dr. Samsa noted Mr. Zinn had difficulty walking and required a cane. (*Id.*). On April 3, 2019, Dr. Samsa noted Mr. Zinn's right leg pain was at an eight, and Mr. Zinn believed he needed knee surgery. (Tr. 551).

Mr. Zinn was treated at the Lake Health Physician's Group Emergency Department on April 12, 2019, where he was diagnosed with a headache, closed-head injury, post-concussion syndrome, and vertigo. (Tr. 681-715). A cervical spine MRI revealed degenerative disk disease and spondylosis, with multiple disk space narrowing and chronic neural foraminal narrowing at C5-C6. (Tr. 716-17).

On April 18, 2019, Mr. Zinn met with Brian Juriga, D.O., who treated his concussion after release from the Emergency Department. (Tr. 721-725). In his intake notes, Dr. Juriga noted that Mr. Zinn stated the recent concussion was possibly his thirtieth. (Tr. 721). Mr. Zinn reported a vision change post-concussion, stating objects and text look bent. (Tr. 722). Dr. Juriga diagnosed Mr. Zinn with intractable acute post-traumatic headache status post-concussion, concussion

9

without loss of consciousness, contusion of scalp, and radiculitis involving upper extremity. (Tr. 724). Dr. Juriga recommended physical therapy for cervical strain, balance therapy, and vestibular-ocular rehabilitation therapy.[2] (*Id.*).

### D.    Physical Therapy

Dr. Walker referred Mr. Zinn to physical therapy for his knee in 2019. (Tr. 856). On April 1, 2019, Mr. Zinn attended his physical therapy appointment wearing a knee brace, but did not use a cane. (Tr. 856). The physical therapist noted a marked limp, and an antalgic and apropulsive[3] gait. (*Id.*). Mr. Zinn handled the physical therapy session poorly and was unable to complete the exercises. (Tr. 857).

On May 31, 2019, Mr. Zinn had positive FABER (flexion, abduction, and external rotation) tests bilaterally, an impaired gait, and required the use of a walking stick to complete the sit-to-stand test. (Tr. 765-66). One visit per week over the course of eight weeks were planned. (Tr. 788). At his second visit, Mr. Zinn put forth good effort at completing the exercises but was unable to complete the session due to pain. (Tr. 788-89).

### E.    State Agency Opinions

---

[2]     Vestibular-ocular rehabilitation therapy is an exercise-based therapy post-concussion designed to enhance gaze and postural stability, improve vertigo, and improve activities of daily living. Byung In Han, et al., *Vestibular Rehabilitation Therapy: Review of Indications, Mechanisms, and Key Exercises*, J. Clin. Neurol. (Dec. 29, 2011) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3259492/ (last visited Nov. 5, 2021).

[3]     An "antalgic" gait indicates a shortened, limping stride resulting from pain. *Antalgic Gait*, *Stedman's Medical Dictionary* (November 2014). An "apropulsive" gait is a characteristically inefficient gait pattern demonstrating excessive overpronation (where the outer edge of the heel strikes first and the foot rolls inward). Jean Mooney, *Apropulsive Gait*, *Illustrated Dictionary of Podiatry and Foot Science* (2009).

Mr. Zinn underwent a consultative examination on July 28, 2018. (Tr. 400-05). Based on the examination, Dr. Jim Bircher opined that Mr. Zinn could walk for 60 minutes, sit for more than an hour at a time, stand for 60 minutes, and lift over 20 pounds. (Tr. 404). Dr. Bircher found no spinal tenderness and no acute joint findings. (*Id.*). X-rays showed diffuse degenerative changes, slight dextroscoliosis to lumbar spine, and decreased cervical lordosis. (*Id.*).

William Bolz, M.D., reviewed Mr. Zinn's file on August 7, 2018 and opined that Mr. Zinn could perform work at the medium level of exertion, but could never climb ladders, ropes, or scaffolds. (Tr. 69-70). On October 1, 2018, Gail Mutchler, M.D., reduced Mr. Zinn's exertional level from medium to light. (Tr. 88). Dr. Mutchler also found Mr. Zinn unable to climb ladders, ropes, or scaffolds, that he needed to avoid extremes of temperature, humidity, and respiratory irritants, and avoid even moderate exposure to hazards. (Tr. 86).

**F.     Victoria Wosciechowski**

Victoria Wosciechowski, Mr. Zinn's sister, completed a third-party function report on June 17, 2019. (Tr. 249-56). In the function report, Ms. Wosciechowski stated her brother was in constant pain, limiting his ability to travel and do house and yard work. (Tr. 249). He also complained about fatigue and depression. (*Id.*). Ms. Wosciechowski reported Mr. Zinn wore the same clothes for days and was unable to bathe or shave regularly. (Tr. 250). She stated she handled all of Mr. Zinn's expenses for him. (Tr. 252). Mr. Zinn would sometimes get confused and have trouble remembering things, so she would have to repeat herself to Mr. Zinn several times. (Tr. 254). She reported Mr. Zinn could not lift anything heavy, had pain when squatting, bending, walking, kneeling, and climbing stairs. (Tr. 254). Ms. Wosciechowski reported Mr. Zinn needed to use crutches, a cane, and a brace/splint constantly. (Tr. 255).

11

## THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since March 28, 2018, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: post-traumatic headaches and seizure disorder status-post multiple concussions; chronic pain disorder, degenerative disc disease of the cervical and lumbar spine; bipolar disorder; post-traumatic stress disorder; generalized anxiety disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a reduced range of light work with the following limitations (*see generally* 20 CFR 416.967(b)). He cannot climb ladders, ropes, or scaffolds. He can occasionally climb ramps and stairs. He is limited to frequent stooping and crouching. He must avoid concentrated exposure to extreme temperatures, humidity, and pulmonary irritants. He must avoid even moderate exposure to unprotected heights, operating of dangerous machinery, and moving mechanical parts. He is further limited to performing simple tasks, following simple instructions, and few if any workplace changes.

5. The claimant has no past relevant work. (20 CFR 416.965).

6. The claimant was born on March 13, 1968, and was 50 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.968).

8. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

9. The claimant has not been under a disability, as defined in the Social Security Act, since March 28, 2018, the date the application was filed (20 CFR 416.920(g)).

(Tr. 17-29).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the district court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security,* 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up). A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the

13

decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted).

Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). *See also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only those claimants who satisfy each element of the analysis, including inability to do other work, and meet the duration requirements, are determined to be disabled. 20 C.F.R. § 416.920(b)-(f). *See also Walters*, 127 F.3d at 529.

DISCUSSION

Mr. Zinn raises three issues for review: first, the ALJ erroneously failed to evaluate the totality of the evidence in the record, including limitations related to Mr. Zinn's severe right knee osteoarthritis; second, the ALJ erred in his credibility determination in violation of Social Security Ruling (SSR) 16-3p; and third, the ALJ committed harmful error by failing to include the need for a cane for balance and ambulation in his RFC. (Pl's Br., ECF #14, PageID 934). I will discuss each alleged error in turn.

**I.      The ALJ's finding that Mr. Zinn's degenerative joint disease was not a severe impairment was harmless error.**

Mr. Zinn asserts the ALJ failed to properly evaluate the totality of the evidence in the record, particularly with respect to finding that the degenerative joint disease in his knees was non-severe. (Pl.'s Br., ECF #14, PageID 942-52). In his first argument, Mr. Zinn also perfunctorily raises error with the ALJ's failure to analyze Mr. Zinn's migraine headaches according to SSR 19-4p, which had been issued the day before the ALJ decided this case. (*Id.* at 951). The Commissioner counters this finding was supported by substantial evidence and Mr. Zinn failed to meet his burden to demonstrate his knee impairment had lasted or would be expected to last at least 12 months. (Def.'s Br., ECF # 16, PageID 979-83).

As to Mr. Zinn's argument regarding the ALJ's analysis of SSR 19-4p, I find the error, if any, was harmless. SSR 19-4p became effective on August 26, 2019; the ALJ's decision was issued on August 27, 2019. (Tr. 12). Mr. Zinn's assertion that SSR 19-4p directs that his migraines "should have been considered as equaling Listing 11.02" is incorrect. (Pl.'s Br., ECF #14, PageID 951). Rather, SSR 19-4p directs ALJs to *analyze* certain headache disorders according to Listing 11.02. It states:

> Primary headache disorder is not a listed impairment in the Listing of Impairments (listings); however, we may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing.
> Epilepsy (listing 11.02) is the most closely analogous listed impairment for [a medically determinable impairment] of a primary headache disorder.

SSR 19-4p (footnotes omitted). The ALJ analyzed Mr. Zinn's impairments according to Listing 11.02, and while the analysis centered on Mr. Zinn's seizure disorder, the ALJ also referenced Mr. Zinn's recurrent migraines. (Tr. 19-21). Therefore, I find no error with respect to SSR 19-4p.

As to Mr. Zinn's allegations regarding his knee impairment being found non-severe, finding an impairment is non-severe at Step Two does not necessarily require remand if the resulting RFC properly incorporates both severe and non-severe impairments. At Step Two of the sequential evaluation process, a claimant is not disabled unless a severe medically determinable impairment is found. 20 C.F.R. § 416.920(c). A severe impairment is one that significantly limits the claimant's ability to perform basic work activities, and must result in death or must last or be expected to last at least 12 consecutive months. *Id.* at §§ 416.920(a)(4)(ii) and 416.909.

Step Two severity regulations have been construed as a *de minimis* hurdle for the claimant to clear in the disability determination process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). Under these regulations, an impairment is determined "not severe" if it does not "significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.922.

16

To clear this *de minimis* hurdle, the claimant must demonstrate more than a "slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs*, 880 F.2d at 862; *see also* SSR 85-28. The severity regulation is intended only to "allow the Secretary to deny benefits summarily to those applicants with impairments of a minimal nature which could never prevent a person from working." SSR 85-28 (quoting *Baeder v. Heckler*, 768 F.2d 547, 553 (3d Cir. 1985)).

However, an ALJ's failure to find a severe impairment where one exists is harmless error where the ALJ determines the claimant has at least one other severe impairment and continues with the remaining steps of the disability evaluation. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). This rule is predicated on the premise that the ALJ considers both severe and non-severe limitations and their effects on the claimant to create an RFC that meaningfully considers the claimant's remaining capacity for work. *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 326 (6th Cir. 2015). The ALJ is responsible to form an RFC appropriate to the claimant's abilities, supported by the ALJ's evaluation of the medical evidence. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). Agency regulations direct the ALJ's RFC assessment to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. SSR 96-8p. An ALJ is to consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's

functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11

(N.D. Ohio May 14, 2020).

Here, the ALJ provided a thorough evaluation of the record, including Mr. Zinn's severe

and non-severe impairments. (*See* Tr. 17-29). Although the ALJ found Mr. Zinn's knee impairment

to be non-severe (Tr. 18), he proceeded through all five steps of the sequential evaluation and

considered the effects of Mr. Zinn's knee impairment when formulating the RFC. (Tr. 24-28).

Ultimately, the ALJ determined Mr. Zinn could work at a light level of exertion despite his knee

impairment. (Tr. 24). The ALJ explained this decision, stating: "Based on the claimant's

inconsistent use of a cane for an unspecified knee issue until recently in August 2018, the

undersigned finds that the claimant's back pain symptoms have restricted him to light work with

additional postural limitations to the extent described in this finding." (Tr. 25). This

determination is one within the ALJ's "zone of choice." *Mullen*, 800 F.2d at 545. I do not

recommend the court interfere with the ALJ's determination on this basis.

**II.      The ALJ did not err in his credibility determination.**

Mr. Zinn alleges the ALJ erred in his credibility determination, in violation of SSR 16-3p.

(Pl.'s Br., ECF #14, PageID 952-55). The Commissioner responds the ALJ's determination was

supported by substantial evidence and should be afforded great weight and deference. (Def.'s Br.,

ECF #16, PageID 983-84). I agree.

An ALJ follows a two-step process for evaluating an individual's symptoms. In step one, the

Commissioner determines whether the individual has a medically determinable impairment that

could reasonably be expected to produce the alleged symptoms. SSR 16-3p. In step two, the

Commissioner evaluates the intensity and persistence of the individual's symptoms and determines

the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second stage, the ALJ may consider evidence directly from the claimant, or gleaned from other medical and non-medical sources. *Id.*

The ALJ is not required to accept the claimant's subjective complaints, and may discount the claimant's subjective testimony when the ALJ deems it inconsistent with objective medical and other evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003). The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p. The ALJ need not use any "magic words," as long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a claimant's demeanor during the hearing—an opportunity this Court is not afforded in its review. *Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints and the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019).

Here, Mr. Zinn argues "the ALJ did not properly evaluate the medical evidence and make a defensible determination as to whether Zinn's testimony was credible." (Pl.'s Br., ECF #14, PageID 953). To demonstrate this error, Mr. Zinn points to the ALJ's evaluation of Mr. Zinn's ability to

play guitar, write music and poetry, care for his therapy dog, live independently, and keep lists. (*Id.*). According to Mr. Zinn, such abilities did not support the ALJ's conclusion that Mr. Zinn could work at a light level of exertion. (*Id.* at 954). The Commissioner points to the same as substantial evidence supporting the ALJ's conclusion. (Def.'s Br., ECF #16, PageID 983-84). The Commissioner also points to the medical evidence on which the ALJ relied, namely the opinion of Dr. Mutchler, as consistent with the opinions of other agency reviewers. (*Id.*; *see also* Tr. 25-28, 84-87, 69-70, 404). I agree with the Commissioner's assessment; the ALJ's evaluation of Mr. Zinn's symptoms was supported by substantial evidence and I have no compelling reason to recommend overturning on this basis.

### III.    The ALJ did not err in failing to include Mr. Zinn's use of a cane or by failing to incorporate the limitations set forth by his treating physician.

Mr. Zinn argues the ALJ erred by failing to meet his burden at Step Five of the sequential evaluation process. (Pl.'s Br., ECF #14, PageID 955). In support, Mr. Zinn points to the opinion of his treating physician, Dr. Kutsikovich, and the physical medical source statement Dr. Kutsikovich provided. (*Id.* at 955-57; *see also* Tr. 461-65). The Commissioner responds that the ALJ's analysis of Dr. Kutsikovich's opinion was properly evaluated according to the regulations set forth in 20 C.F.R. § 416.920c. (Def.'s Br., ECF #16, PageID 984-86). I agree with the Commissioner.

Under 20 C.F.R. § 416.920c, for claims filed on or after March 27, 2017, the ALJ is to articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. § 416.920c(b). The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, and is not required to give a treating source controlling weight. *Id.* at § 416.920c(a). Instead, the ALJ must

articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors"—supportability[4] and consistency.[5] *Id.* at § 416.920c(b).

The ALJ is responsible to form an RFC appropriate to the claimant's abilities, supported by the ALJ's evaluation of the medical evidence. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). The RFC is to be an assessment of the claimant's remaining capacity for work, once the claimant's limitations have been considered. *Id.* at 632. An ALJ is to consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ also must determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* The ALJ is not required to implement all suggested limitations and may impose more restrictions than are set forth in a medical opinion. Doing so does not mean an RFC is not supported by substantial evidence. *Ross v. Comm'r of Soc. Sec.*, No. 14-11144, 2015 WL 1245830, at *11 (E.D. Mich. Mar. 18, 2015).

With respect to Mr. Zinn's use of a cane, the Sixth Circuit has held that if a cane is not medically necessary, it cannot be considered an exertional limitation on the claimant's ability to

---

[4]     "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[5]     "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

work. *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002). A cane would be deemed medically necessary if the record reflects more than the claimant's subjective desire to use one. *Id.* In that case, it would trigger an obligation on the part of the Agency to conclude the cane is medically necessary and include such limitations in its analysis. *Simpkins v. Berryhill*, No. CV 17-43-DLB, 2017 WL 3821684, at *3 (E.D. Ky. Aug. 31, 2017).

Here, the ALJ noted Mr. Zinn's use of a cane throughout his determination. (Tr. 18-19, 21, 25-26). However, the ALJ found, based on his review of the evidence as a whole, that Mr. Zinn's use of a cane was inconsistent throughout the adjudicating period. (*Id.*). In his determination, the ALJ states, Mr. Zinn "has been using a cane to his mental health appointments on occasion since March 2019" (Tr. 18) and "has used a cane intermittently throughout the record in recent months, alleging balance issues due to his seizure disorder or a minimally documented right knee impairment." (Tr. 19). Furthermore, "although [Mr. Zinn] was using a cane for a 'knee issue,' he denied any falls in the last year and he did not mention his seizures." (Tr. 21). And, "based on the radiological evidence and the claimant's inconsistent use of a cane . . .  the undersigned finds that the claimant's back pain symptoms have restricted him to light work with additional postural limitations to the extent described in this finding." (Tr. 25).

The ALJ's analysis of Mr. Zinn's use of a cane is consistent with Sixth Circuit precedent and with 20 C.F.R. § 416.920c. Although there is evidence in the record to show Mr. Zinn's need for a cane, the ALJ found that evidence to be inconsistent with the record as a whole and demonstrating Mr. Zinn's preference for its use, rather than its requirement as medically necessary. Although contrary evidence is present in the record, an ALJ's finding, if supported by substantial

evidence, must be upheld even if evidence could support a contrary finding. *Jones*, 336 F.3d at 476-77.

The ALJ's handling of Dr. Kutsikovich's opinion is also supported by substantial evidence and is consistent with 20 C.F.R. § 416.920c. The ALJ compared Dr. Kutsikovich's longitudinal treatment notes for Mr. Zinn with the four-page form Dr. Kutsikovich completed and found the report inconsistent with the treatment notes and the medical record. (Tr. 26). The ALJ states he was not persuaded by the report because "the totality of the medical evidence, including [Dr. Kutsikovich's] own treatment notes, fails to establish the extreme exertional limitations that he apparently opined." (*Id.*). The ALJ also noted inconsistencies in the handwriting on the form as support for finding Dr. Kutsikovich's report unpersuasive. (*Id.*). Dr. Kutsikovich signed off on the form and it may thereby be attributed to him. (Tr. 461-65). However, the ALJ properly articulated his reasons for finding the report unpersuasive, consistent with 20 C.F.R. § 416.920c. The ALJ described the medical evidence he reviewed and properly articulated his reasons for reaching his determination, allowing for this Court's review. Accordingly, I cannot recommend disturbing the ALJ's determination on this basis.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I find the ALJ's decision denying SSI is supported by substantial evidence. Therefore, I recommend that the District Court **AFFIRM** the Commissioner's decision.

Dated: November 10, 2021

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE


*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).